**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JAMES M. YANOSKI,

      Plaintiff,

        v.

SILGAN WHITE CAP AMERICAS, LLC,

      Defendant.

CIVIL ACTION NO. 3:14-CV-01862

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court is a Motion for Summary Judgment (Doc. 29) filed by Defendant Silgan White Cap Americas, LLC ("Defendant" or "Silgan").  Plaintiff James M. Yanoski ("Plaintiff" or "Yanoski") asserts discrimination and retaliation claims against Defendant for allegedly terminating his employment based on his muscular dystrophy.  In moving for summary judgment, Defendant asserts that Plaintiff failed to establish a prima facie case of discrimination and that even if he did, he failed to establish that the legitimate, non-discriminatory reasons proffered for his termination were pretextual.  Because Plaintiff has failed to oppose Defendant's motion for summary judgment on his retaliation claim, Defendant's motion for summary judgment on this claim will be granted.  However, because there is a genuine issue of material fact as to whether Defendant discriminated against Plaintiff based on his disability and whether the legitimate, non-discriminatory reasons proffered for his termination were pretextual, Defendant's motion for summary judgment on the discrimination claims will be denied.

## I. Background

**A.     Silgan and the Hazleton Plant**

Silgan operates a manufacturing plant in West Hazleton, Pennsylvania (the "Plant"), producing plastic and metal container closures.  Silgan employed Plaintiff as a Press Mechanic at the Plant from 1988 until his termination on August 23, 2013.

Silgan maintained Collective Bargaining Agreements (collectively, the "CBA") with the Glass, Molders, Pottery, Plastics and Allied Workers International Union AFL-CIO, CLC, Local 237 (the "Union"), effective May 2010 through April 2013 and April 2013

through April 2015.  Article 34 of the CBA provides that "[t]here shall be no discrimination against any employee because of race, color, creed, national origin, sex, age, or disability in the administration and application of this Contract."  (Doc. 29-16, Def. Ex. B, Contract Agreement, at 51.)  Article 36 of the CBA provides that "[a]n employee who is physically disabled or infirmed by reason of occupational injury or illness and who is unable to work his regular job may be placed on any available job which he is physically able to perform." (*Id.* at 52.)  Article 9, Section 6(g) of the CBA provides that an employee, with five (5) or more years of service, maintains eligiblity and seniority for two (2) years from the date of medical leave.  (*Id.* at 11.)  Under the CBA, Silgan may terminate employment after two (2) years of medical leave.  (*Id.*)

Press Mechanics at the Plant, like Plaintiff, operate high-speed punch presses and assembly machines on all production lines to produce caps that are within specification. Press Mechanics work on different "lines," namely, Lines 1-15.  The Press Mechanic Job Description and the Job Demands Analysis applies to all lines.  Press Mechanics load sheets or "strips" of metal into line presses, which punch out caps forming lids for containers.

Lines 3-8, 12, and 15 utilize double die single presses.  Double die single press lines require lifting and loading multiple strips into the machine.  The size of the strip varies according to what size cap is being produced.  One inch of strip is the minimum amount needed to keep a double die single line press operating, but Press Mechanics can lift and load as much as they can comfortably and safely handle.  For instance, once a Press Mechanic loads a single press with a foot-and-a-half of strips, the Press Mechanic can leave the press, and perform other duties, as the press continues to operate.  The punched-out caps then flow to the back end of the line toward the inspection and retooling stations.  One Press Mechanic works each of Lines 3-8 and 12.

**B.    Line 15**

Two (2) Press Mechanics work Line 15.  To enter and exit the die area on Line 15, Press Mechanics must use one (1) of five (5) stairways, each of which includes two (2)

stairs and two (2) handrails.  Line 15 has three (3) double die single presses (A, B, and C) and a different set-up for the back end compound machine, which manufactures a hermetic seal for jars.

Press Mechanics on the front end of Line 15 are able to lift as many strips as they like, as long as the machine does not run out of strips.  The back end Line 15 Press Mechanics handle quality checks and mechanical specification issues, enters quality checks into a computer, and clears press jams by lifting a protective door to the machines and removing any strips causing the jam.  Generally, Plaintiff worked on the back end of Line 15.  The two (2) Press Mechanics split up the lifting duties on the front end of Line 15.  Between Plaintiff and his partner, they typically lifted about 20,000 pounds in a twelve (12) hour shift on Line 15.

## C.   Plaintiff's Muscular Dystrophy

Around 2008 or 2009, Plaintiff was diagnosed with muscular dystrophy by Dr. Scott Freedenberg, the head neurologist at Geisinger Medical.  (Doc. 34-5, Ex. P-3, Geisinger Medical Records, at 101; Doc. 34-4, Ex. P-2, James M. Yanoski Dep., at 79:9-24.)  Following the diagnosis and throughout his working career, Plaintiff did not request or require any accommodation for muscular dystrophy.  He never sought short-term disability benefits, long-term disability benefits, or Social Security Disability Insurance for muscular dystrophy, nor has any doctor suggested that he explore these possible avenues due to his muscular dystrophy.  Plaintiff did not tell anyone except very close family about his muscular dystrophy.

Throughout his career at Silgan, Plaintiff's supervisors regarded him as a hard worker and a good employee with above-average mechanical skills.  Production Supervisor Fred Huntowski, who occasionally supervised Plaintiff until 2010, never observed Plaintiff having any difficulty loading strips.  He did notice that Plaintiff walked in a straight-legged manner.  He did not know that Plaintiff had muscular dystrophy, nor did Plaintiff ever discuss his muscular dystrophy with Mr. Huntowski.

Production Supervisor George Yencha, who supervised Plaintiff from 2004 until

2011, was impressed with the amount of strips Plaintiff was able to lift, which was two (2) or three (3) times the amount that Mr. Yencha could lift.  Mr. Yencha estimated that he could lift three-quarters of an inch of eighty-two (82) plate, or around forty (40) pounds, while Plaintiff was able to lift two (2) inches of eighty-two (82) plate, or about one hundred (100) pounds.  Mr. Yencha noticed that Plaintiff walked with a limp, but never discussed it with Plaintiff.

John Connors, Silgan's Plant Manager, never observed nor was ever aware that Plaintiff had any difficulty performing the physical requirements of the Press Mechanic position.

**D.     Plaintiff's History of Neck and Shoulder Injuries**

Plaintiff has a history of disc herniation and neck pain dating back to at least 2004. Plaintiff also has a history of shoulder problems dating back to at least the 1980s. Around 1988, Plaintiff suffered a work injury at his former job, resulting in a right parascapular muscle weakness and leaving him with difficulty raising his right arm above shoulder level.  None of these injuries are related to Plaintiff's muscular dystrophy.

On August 18, 2011, Plaintiff suffered a work injury to his left shoulder while working the back end of Line 15 at Silgan.  On August 20, 2011, Plaintiff again injured his left shoulder while working the back end of Line 15.  Mr. Yencha took Plaintiff to Hazleton General Hospital for treatment immediately following the injury on August 20, 2011.  It is Silgan's policy to return an employee to work as soon as practicable, with or without restrictions, after experiencing a work-related injury.

On August 23, 2011, Plaintiff returned to work and was assigned light duty work sorting caps, but shortly thereafter, reported that he could not continue performing the work because he was experiencing too much pain.  Prior to these August work-related injuries, Plaintiff never had any restrictions lifting and loading strips.

**E.     Plaintiff Begins Workers' Compensation**

As a result of Plaintiff's work-related injuries, Nancy Trovitch, Silgan's Plant Human Resources Manager, filed a Workers' Compensation First Report of Injury or

4

Illness on August 22, 2011, with Silgan's workers' compensation insurer, ESIS.  In turn, ESIS hired Coventry Health Care for Aetna Insurance ("Coventry") to help manage Plaintiff's workers' compensation claims.  Janet Dennis, a Certified Registered Nurse and Rehabilitation Nurse for Coventry, served as the Nurse Case Manager for Plaintiff's workers' compensation claim.  As Nurse Case Manager, Ms. Dennis evaluates, assesses, and coordinates care services for injured workers on behalf of the insurance carrier.

From August 26 through October 21, 2011, Plaintiff was treated by Dr. Anthony Falvello.  On September 23, 2011, Dr. Brad Wood of Dr. Falvello's office instructed Plaintiff not to work for twenty-one (21) days.  (Doc. 29-32, Def. Ex. R, at 141.)  Following Plaintiff's appointment on September 23, 2011, Ms. Dennis sent ESIS an initial report of Plaintiff's workers' compensation claim, which reported that Plaintiff stated that he has a pre-existing diagnosis of muscular dystrophy.  (Doc. 29-34, Def. Ex. T, at 92.)

## F.   October 17, 2011 Examination with Dr. Falvello

On October 17, 2011, Dr. Falvello examined Plaintiff.  (Doc. 29-35, Def. Ex. U, Dr. Falvello's Report, at 141.)  Dr. Falvello found that Plaintiff's injuries from August 2011 were consistent with a pre-existing C5-6 disc herniation, as a previous MRI from 2009 revealed bulging and posterior spurring at the C5-6 disc.  In his report, Dr. Falvello released Plaintiff to return to work, with various restrictions pertaining to the amount of weight Plaintiff could lift and carry, as well as kneeling, climbing, and various other activities.  Dr. Falvello also noted at the October 17, 2011 examination, in Ms. Dennis' presence and Plaintiff's presence, that Plaintiff had a history of muscular dystrophy.  Ms. Dennis asked Dr. Falvello whether muscular dystrophy had any effect on Plaintiff's work-related injury.  Dr. Falvello answered in the negative, stating that Plaintiff's work injury was unrelated to Plaintiff's muscular dystrophy.  Following Plaintiff's visit with Dr. Falvello, Ms. Dennis prepared and forwarded an activity report to ESIS, namely Kristin Swineford, but not to Ms. Trovitch or anyone else at Silgan.

On October 19, 2011, Ms. Trovitch and Plaintiff had a telephone call, during which

Ms. Trovitch told Plaintiff that she would talk to Mr. Connors to find Plaintiff work with his restrictions.  Plaintiff reminded Ms. Trovitch that he could not lift and that sorting was not an option.  Ms. Trovitch told Plaintiff to continue going to physical therapy and to call her the following week.  Plaintiff asked if Ms. Trovitch knew what was wrong with him, to which Ms. Trovitch stated that she knew Plaintiff walked funny, but she did not know that there was anything wrong with him.  Plaintiff then asked Ms. Trovitch, "so you don't know that I have muscular dystrophy," to which Ms. Trovitch replied, "no."  Plaintiff responded that "not many people do."

During the phone call with Ms. Trovitch, Plaintiff did not ask for any accommodations to perform work, and stated that he did not need any accommodations for his muscular dystrophy.  On October 19, 2011, Ms. Trovitch summarized her conversation with Plaintiff in an e-mail to Claudia Rinaldi, Silgan's Regional Human Resources Manager assigned to Silgan's Midwestern locations, including the Hazleton Plant; Mr. Connors; Ms. Swineford; and Ms. Dennis, in which she stated that Plaintiff could not do his normal job on Line 15, that he could not lift anything, and that he had muscular dystrophy.

On October 21, 2011, based on Dr. Falvello's finding that Plaintiff's injury was an aggravation of a pre-existing C5-6 disc herniation, ESIS denied Plaintiff's workers' compensation claim.  On October 24, 2011, Ms. Trovitch and Plaintiff had a phone call during which they discussed why ESIS denied his workers' compensation claim.  Plaintiff asserts that during this conversation, Ms. Trovitch stated that he could not come back in any capacity because he was too much of a liability.  (Doc. 29-21, Def. Ex. G, at 33.) Ms. Trovitch advised Plaintiff that in order to return to work, he would need to be released to return by a doctor.  (Doc. 29-18, Def. Ex. D, at 130.)  She also advised Plaintiff that he should apply for Family and Medical Leave Act ("FMLA") leave.  (Doc. 29-21, Def. Ex. G, at 33.)  Both Mr. Sallemi and Mr. Connors testified that requesting updated medical information is a common practice before returning an employee to work from extended

medical leave.  (Doc. 29-12, Bennett Sallemi Dep., at 18:1-10[1]; Doc. 29-13, John Connors Dep., at 128:9-22.)

## G.    FMLA Leave

On November 11, 2011, Plaintiff submitted a request for FMLA leave.  He requested this leave for his August 2011 work injury, not his muscular dystrophy.  The form advised Plaintiff that he would be required to present a fitness-for-duty certificate to be restored to full employment, and that the fitness-for-duty certification must address his ability to perform the essential job functions.  (Doc. 29-39, Def. Ex. Y, at 571.)  This leave request was approved by Silgan.

Ms. Trovitch sent letters to Plaintiff enclosing a Leave of Absence Request Form on a monthly basis from March 2012 through June 2013.  Plaintiff received the Leave of Absence Request Forms each month.  The purpose of sending these Leave of Absence Request Forms is to inform an employee on medical leave or FMLA leave of his or her employment status and to advise the employee of his or her obligation to provide updated documentation as to his or her condition.  Article 24, Section 4.7(II)(c) of the CBA requires an employee on medical leave to contact the Human Resource Department on a weekly basis regarding their medical status during the time of disability.  (Doc. 29-16, Def. Ex. B, at 44.)  Plaintiff returned only one (1) Leave of Absence Request Form, dated March 21, 2012.  (Doc. 29-40, Def. Ex. Z.)

## H.    Plaintiff's Examinations with Dr. Kline

While Plaintiff's workers' compensation claim was pending, Plaintiff saw Dr. John Kline, M.D., at Northeastern Rehabilitation Associates on November 29, 2011.  Dr. Kline found that Plaintiff had a left shoulder impingement syndrome, a left cervical strain or sprain, as well as aggravation of pre-existing C5-6 disc pathology.  (Doc. 29-41, Def. Ex.

---

[1]      Defendant cites to page 17 of Mr. Sallemi's deposition transcript for this proposition.  (Doc. 29-1, Statement of Facts, ¶ 150.)  However, both parties failed to include page 17 of Mr. Sallemi's deposition transcript in their exhibits.  (*See* Doc. 29-12; Doc 34-12, Ex. P-10.)  The parties are advised that in future pleadings, all pages cited to should be submitted to the Court.

AA, Dr. Kline's November 29, 2011 Report.)  He further found that Plaintiff's shoulder and neck injuries were unrelated to Plaintiff's muscular dystrophy.

Dr. Kline released Plaintiff to return to work, but restricted Plaintiff to sedentary work, lifting and carrying no more than ten (10) pounds, and avoiding repetitive flexion of the cervical spine.  Ms. Trovitch testified that she had received this report, and when asked why she did not contact Plaintiff about returning to work after receiving this report, she testified, "I don't know."  (Doc. 34-9, Ex. P-7, Nancy Trovitch Dep., at 83:11-85:5.)

Plaintiff saw Dr. Kline again on February 3, 2012.  Dr. Kline again restricted Plaintiff to sedentary to light modified work, lifting and carrying up to a maximum of fifteen (15) pounds.  (Doc. 29-42, Def. Ex. CC.)

**I.     Plaintiff's Workers' Compensation Hearing**

Plaintiff's workers' compensation hearing was held on May 8, 2012.  (Doc. 29-43, Def. Ex. DD.)  Plaintiff testified at the hearing that his left shoulder had gotten better and that he was having neck problems, but that they were strictly related to the pre-existing neck problems that he had prior to the August 2011 injuries.  Plaintiff further testified that he did not know whether he could return to his pre-injury job or whether he could perform light duty work sorting caps, based on his concern of deconditioning since he had been out of work for so long.

**J.     Plaintiff's Examinations with Dr. Krassen**

On June 25, 2012, Plaintiff saw Dr. Joshua Krassen, D.O., of VSAS Orthopedics for an Independent Medical Evaluation.  (Doc. 29-45, Def. Ex. EE.)  Dr. Krassen determined that Plaintiff's shoulder sprain had been resolved and that he is "certainly fully recovered from his injury to the left shoulder."  (*Id.* at 238-39.)  He also reported that he did not feel that Plaintiff's muscular dystrophy had any role in Plaintiff's symptoms and was not disabling him in any way.  (*Id.* at 239.)  Dr. Krassen released Plaintiff to return to work at light to medium work and restricted him to lifting no more than twenty-five (25) pounds.

On February 27, 2013, the workers' compensation judge determined that Plaintiff

8

had fully recovered from his work-related injuries as of June 25, 2012, and awarded Plaintiff workers' compensation benefits through June 25, 2012.  (Doc. 29-46, Def. Ex. FF.)

On March 7, 2013, Plaintiff sent Ms. Trovitch a letter asking what he needed to do to return to work. (Doc. 29-48, Def. Ex. HH.)  Upon receiving the letter, Ms. Trovitch conferred with Ms. Rinaldi as to how respond to Plaintiff because Plaintiff had said that he could not perform work on Line 15 and could not perform work sorting.

On March 19, 2013, Plaintiff appealed the workers' compensation decision.  (Doc. 29-49, Def. Ex. II.)  On March 22, 2013, Plaintiff informed Ms. Trovitch that he filed the appeal because Silgan had not responded to his March 7, 2013 letter, letting him know if he had a job or not.  (Doc. 29-50, Def. Ex. JJ.)  Plaintiff also told Ms. Trovitch that he did not agree with the workers' compensation judge's decision.  Ms. Trovitch asked Plaintiff if he could do his job, to which he responded as follows:

> I don't know.  Do I lift 10,000# now?  No.  I can try but if I am thrown in the rock pile on Line 15, I will just have to try.  I don't know what to say.  Until I try it, I don't know.

(Doc. 29-50, Def. Ex. JJ.)

## K.    Plaintiff's Examinations with Dr. Haber

On March 26, 2013, Ms. Trovitch sent Plaintiff the Press Mechanic Job Description and Job Demands Analysis and asked Plaintiff to have his doctor sign off on all the essential functions of the job.  (Doc. 34-4, Ex. P-2, James M. Yanoski Dep., at 134:22-135:10; Doc. 29-51, Def. Ex. KK, at 290.)  Dr. Haber is Plaintiff's longest-treating physician.  Plaintiff gave Dr. Haber the Press Mechanic Job Description and the Job Demands analysis as requested by Ms. Trovitch, which Plaintiff testified that Dr. Haber reviewed.  (Doc. 34-4, Ex. P-2, James M. Yanoski Dep., at 135:6-7.)  Dr. Haber examined Plaintiff and asked him to do the following:

> Arm pulls, things like that, strength, grabbed ahold of my wrists, pull me towards you, push me away from you, things like that, lift your arm, turn your neck, things like that.

(Doc. 34-4, Ex. P-2, James M. Yanoski Dep., at 135:14-17.)  Dr. Haber did not ask

Plaintiff to lift thirty-five to fifty pounds (35-50 lbs.), step up on any stairs, or lift any sort of weight or device.  (Doc. 34-4, Ex. P-2, James M. Yanoski Dep., 135:18-24.)

On April 4, 2013, Dr. Haber provided Plaintiff with a note releasing him to return to work, stating that:

> [P]laintiff may return to his full job no restrictions as before.  The pre-existing condition of C5-6 and MD still present remains unchanged.  The patient may be as active in his position as before.

(Doc. 29-52, Def. Ex. LL, at 296.)  Silgan received Dr. Haber's note, but Ms. Trovitch, Ms. Rinaldi, and Mr. Connors testified that they did not know whether Dr. Haber had reviewed the Job Description or signed off on Plaintiff performing the Press Mechanic position's essential functions.  (Doc. 29-11, Rinaldi Dep., at 90:12-21; Doc. 29-13, John Connors Dep., at 130:15-132:7; Doc. 29-10, Nancy Trovitch Dep., at 76:21-23.)  There is no specific assessment of the Job Demands Analysis on Dr. Haber's note.  However, while Rinaldi acknowledged that it would have been prudent to ask Dr. Haber if he had reviewed the job description and the job demands analysis, no one did so.  (Doc. 34-10, Ex. P-8, Claudia Rinaldi Dep., at 91:9-92:8; Doc. 34-9, Ex. P-7, Nancy Trovitch Dep., at 118:2-21; Doc. 34-13, Ex. P-11, John Connors Dep., at 131:21-23.)

On or around May 1, 2013, Plaintiff met with Ms. Trovitch and Union President Joe Dulluso and confirmed his understanding that he would undergo a fitness for duty examination with Dr. Nancy Spangler.  (Doc. 29-55, Def. Ex. OO, at 308; Doc. 29-18, Def. Ex. D, at 134.)  Fitness for duty examinations answer the question of whether a patient is ready to perform their regular job duties.  The Union did not contest Silgan's right to require Plaintiff to undergo a fitness for duty examination.  (Doc. 29-12, Bennett Sallemi Dep., at 21:6-8.)

## L.    Dr. Spangler and Plaintiff's Fitness for Duty Examination

On May 1, 2013, Ms. Trovitch mailed Dr. Spangler a letter stating that Plaintiff was given a copy of his job description and asked to take it to his doctor to be released to each duty.  Ms. Trovitch noted that Dr. Haber had previously written a note releasing Plaintiff to return to work, but that the note did not specifically address if he was capable

of doing the essential functions of the job.

Ms. Trovitch requested that Dr. Spangler examine Plaintiff as to his fitness to return to work as a Press Mechanic performing all essential job duties.  (Doc. 29-56, Def. Ex. PP, at 68-69.)  Ms. Trovitch included in her letter to Dr. Spangler the following documents:  Dr. Haber's note, an executed HIPAA release form, the Press Mechanic Job Demands Analysis and Job Description, and photos of the back-end of Line 15 where Plaintiff was injured in August 2011.

On May 21, 2013, Dr. Spangler evaluated Plaintiff for a fitness for duty examination.  Dr. Spangler has specialized in occupational medicine since 1991 and has performed approximately a dozen fitness for duty examinations for Silgan.  When conducting a fitness for duty examination, Dr. Spangler performs a physical examination and reviews records from a treating physician and will sometimes, depending on the type of work that the patient does, perform a lifting evaluation.

Dr. Spangler reviewed the Press Mechanic Job Description in detail.  Dr. Spangler did not know that Plaintiff had muscular dystrophy until he told her during the examination.  Plaintiff told her that his muscular dystrophy was stable and not worsening. Dr. Spangler found that Plaintiff had some weakness in his right triceps muscle and scapular region, which Plaintiff said was chronic, and found other abnormalities that were consistent with muscular dystrophy.  Plaintiff told Dr. Spangler that muscular dystrophy would not affect his ability to return to work.  Plaintiff reported no fatigue or muscle weakness to Dr. Spangler.  Plaintiff expressed his concern about his general deconditioning since he had been away from his job a long time and was out of shape.

As a result of this examination, Dr. Spangler was unable to determine in the exam room whether or not Plaintiff was capable of performing all of the functions of the Press Mechanic, and felt that the only way she could hope to determine his fitness for duty was a full functional capacity evaluation, which she did not have the authority to order without consent from Defendant, who would be responsible for its cost.  (Doc. 29-19, Def. Ex. E, Dr. Spangler Report, at 328.)  A full functional capacity examination examines a patient's

11

entire body as he or she performs physical maneuvers, such as lifting, to assess the patient's functional status.  Dr. Spangler told Plaintiff that Silgan would be responsible for the full functional capacity examination.

Following Dr. Spangler's examination, Ms. Rinaldi communicated to Mr. Sallemi that Silgan pays for fitness for duty examinations but does not pay for additional testing, such as the full functional capacity exam, as he was still covered by his employer-provided insurance.  On June 13, 2013, Ms. Trovitch wrote to Plaintiff that Dr. Spangler was unable to release Plaintiff to full duty based on her examination of Plaintiff.  (Doc. 29-57, Def. Ex. QQ, at 324.)  The letter further stated that pursuant to Article 9, Section 6(g) of the CBA, Plaintiff's seniority and benefits would terminate as of August 23, 2013.

## M.   Grievance Meeting

On July 1, 2013, Plaintiff filed a grievance under the CBA's grievance and arbitration procedures.  In his grievance, he alleged that Silgan committed an unfair labor practice because Silgan refused to allow Plaintiff to return to work even though Plaintiff was capable of doing so.  (Doc. 29-58, Def. Ex. RR.)  On July 8, 2013, Silgan held a Step 3 grievance meeting with Head Production Supervisor Mike Kennedy, Mr. Connors, Mr. Sallemi, and Union President Dino Oberto in attendance.  At the meeting, Plaintiff suggested that he not work on Line 15 because he could not perform the essential functions of the Press Mechanic position on Line 15.  He also noted that he was experiencing issues with stamina and strength.  Plaintiff requested that if he were to work on Line 15, that he would occasionally need help loading strips.  Prior to July 8, 2013, Plaintiff never asked for any accommodations or for any special treatment.

Mr. Sallemi testified that in his experience, an employee has never returned from a medical leave and was allowed *not* to work on a particular line.  (Doc. 29-12, Bennett Sallemi Dep., at 37:21-38:1.)  However, he testified that employees had been given alternative positions, such as going from line mechanic to auditor service.  (*Id.* at 37:25-38:4.)  He further testified that this had not been offered to Plaintiff.  (*Id.* at 38:5-6.)  He also testified that he believes that employees frequently receive assistance lifting plates

12

on Line 15.  (*Id.* at 38:7-10.)

Following the Step 3 grievance meeting, Mr. Connors, Ms. Rinaldi, and Ms. Trovitch discussed Plaintiff's request not to work Line 15 and his professed stamina and weakness issues together with the fact that Plaintiff had presented no medical restrictions.  (Doc. 29-13, John Connors Dep., at 162:3-12.)

On July 18, 2013, Silgan denied Plaintiff's grievance in writing, stating that following a fitness for duty examination, he had not been released to return to work, and that any discussion on accommodations would require medical documentation from a doctor.  (Doc. 29-58, Def. Ex. RR, at 89.)  The letter further stated that it was not up to Silgan to pay for additional medical evaluations in the event that a doctor is unable to release any employee back to work after a fitness for duty examination for whatever cause.  (*Id.*)

### N.      Full Functional Capacity Examination

On or before July 18, 2013, Ms. Trovitch called Dr. Spangler's office seeking a recommendation as to where Plaintiff could complete a full functional capacity examination.  Dr. Spangler's office would not give a recommendation but said that generally, any physical therapist could do it.  (Doc. 29-61, Def. Ex. UU.)  Ms. Rinaldi testified in her deposition that she requested through Mr. Sallemi that Plaintiff provide additional medical information about his requested accommodation and that, until he did so, Silgan would not grant his request not to work on Line 15.  (Doc. 29-11, Claudia Rinaldi Dep., at 122:22-123:8.)  However, she also testified that she had never put this in writing to Plaintiff.  (*Id.* at 122:22-123:15.)

On July 22, 2013, Mr. Sallemi e-mailed Ms. Trovitch and Ms. Rinaldi reminding them that he had previously informed Ms. Trovitch that Plaintiff was willing to go for a full functional capacity evaluation, and requested a recommendation from Dr. Spangler as to where to get a full functional capacity evaluation.  (Doc. 29-62, Def. Ex. VV, at 304.)  Ms. Rinaldi responded to Mr. Sallemi's e-mail later that day, letting him know that Ms. Trovitch had called Dr. Spangler's office, Dr. Spangler's office did not provide recommendations,

and that she did not know which physical therapy facilities accepted Plaintiff's health insurance.  On July 24, 2013, Mr. Sallemi forwarded Ms. Rinaldi's e-mail to Plaintiff.  (*Id.* at 303-04.)

On July 24, 2013, Plaintiff e-mailed Mr. Sallemi, stating that if he was going to pay for the exam, he needed something in writing from Ms. Rinaldi or Ms. Trovitch that would state that if he passed or qualified for full capacity duty, he would be reinstated.  (*Id.* at 305.)  Mr. Sallemi e-mailed Plaintiff and told him that Plaintiff needed to pick a location and complete the full functional capacity testing.  (*Id.* at 303.)

Plaintiff and the Union ultimately decided not to pay for, and for Plaintiff not to attend, a full functional capacity examination.  This was because Defendant apparently never acknowledged Plaintiff's request for reassurance that if he passed the exam, he would be reinstated.

Following the Step 3 grievance meeting, the Union withdrew the grievance.  The Union did not pursue arbitration under the CBA because Mr. Sallemi believed that the arbitrator would not decide issues relating to the Americans with Disabilities Act ("ADA").  Silgan never indicated to the Union that it would not submit the ADA question to an arbitrator.

On August 23, 2013, Silgan terminated Plaintiff's employment under the terms of Article 9, Section 6(g), which gives the Company the right to terminate employment after two (2) years of medical leave.

## II. Discussion

### A.    Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

14

moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 247-48. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When considering whether there are genuine issues of material fact, the court is required to "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at

256-57.  The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

In order to prevail on a motion for summary judgment, the non-moving party must show "specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial."  *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)).  Although the non-moving party's evidence may be either direct or circumstantial, and "need not be as great as a preponderance, the evidence must be more than a scintilla."  *Id.* (quoting *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)).  In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

## B.    Plaintiff's Retaliation Claim

In his Complaint, Plaintiff asserts a retaliation claim against Defendant, alleging that Defendant fired Plaintiff after filing a grievance opposing the unlawful employment practices of Defendant.  (Doc. 1, Compl. ¶¶ 41-44.)  To establish a prima facie case of retaliation under the ADA, a plaintiff must show (1) protected employee activity, (2) adverse action by the employer either after or contemporaneous with the employee's protected activity, and (3) a causal connection between the employee's protected activity and the employer's adverse action.  *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004) (citations and internal quotation marks omitted).  Once a prima facie case is established, courts apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which applies to ADA retaliation claims, *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).  Under that framework, the burden

16

then shifts to the employer to advance a "legitimate, non-retaliatory reason for its adverse employment action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).  The employer's burden at this stage is "relatively light:  it is satisfied if the defendant articulates any legitimate reason for the adverse employment action." *Krouse*, 126 F.3d at 494 (internal quotation and editorial marks omitted).  Once an employer meets that burden, the burden shifts back to the employee, who then must "prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Shaner*, 204 F.3d at 500 (citation and internal quotation marks omitted).  Although the burden of production shifts under this three-part framework, the burden of persuasion remains at all times on the employee.  *Id.* at 500-01 (citation and internal quotation marks omitted).

It is well-established that a party's failure to argue an issue on summary judgment constitutes a waiver of that issue.  *See Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003) (deeming the plaintiff's claim waived for failure to respond to the defendant's argument in a motion for summary judgment); *see also Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011) (affirming district court order granting summary judgment for defendants on ADA claim where plaintiff made "no attempt" to oppose the defendant's argument regarding pretext).  Here, Plaintiff has failed to address Silgan's argument with respect to his claim of retaliation in response to Defendant's Motion for Summary Judgment.  Specifically, Plaintiff does not respond to Defendant's argument that he failed to establish "but for" causation, *i.e.*, a causal connection between the employee's protected activity and the employer's adverse action.  Additionally, Plaintiff does not dispute Defendant's argument that Plaintiff failed to exhaust administrative remedies on his retaliation claim because he failed to allege retaliation in his administrative complaint.  *See, e.g.*, *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 453

17

(3d Cir. 2006) (affirming order granting summary judgment in favor of the defendants on retaliation claim because the plaintiff failed to mention retaliation in her PHRC complaint); *Gillette v. Donahoe*, No. 3:12-cv-1852, 2013 WL 2043149, at \*4-\*5 (M.D. Pa. May 14, 2013) (granting motion to dismiss retaliation claims for failure to exhaust administrative remedies because the plaintiff only alleged discrimination in his EEOC complaint and did not check the box for retaliation).  Accordingly, Defendant's Motion for Summary Judgment on this claim will be granted.

## C.   Plaintiff's Prima Facie Discrimination Claim

In addition to his retaliation claim, Plaintiff also argues that Defendant discriminated against him based on his disability, specifically by failing to grant his requested accommodation, failing to offer an alternative accommodation, and firing Plaintiff as a result of his muscular dystrophy.  (Doc. 1, Compl. ¶¶ 32-37.)  The ADA prohibits any covered entity from discriminating "against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  The ADA further defines a "qualified individual" as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

The plaintiff bears the initial burden of proving that he is qualified and, "if an accommodation is needed, the plaintiff must show, as part of [his] burden of persuasion, that an effective accommodation exists that would render [him] otherwise qualified." *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 670 (3d Cir. 1999) (citation and internal quotation marks omitted).  A disabled employee thus establishes a prima facie case for a claim under the ADA "if [he] shows that [he] can perform the essential functions of the job with reasonable accommodation and that the employer refused to make such an accommodation."  *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 284

(3d Cir. 2001).

A defendant employer is not required to maintain the employment of a plaintiff whose proposed accommodation for a disability is "clearly ineffective." *Walton*, 168 F.3d at 670 (citation and internal quotation marks omitted).  But an employee does not act unilaterally in suggesting a reasonable accommodation.  Rather, an employee's request for a reasonable accommodation requires "a great deal of communication between the employee and employer," as both parties "bear responsibility for determining what accommodation is necessary." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999) (citation and internal quotation marks omitted).

Here, Defendant argues that (1) Plaintiff was not disabled within the meaning of the ADA, (2) he was not qualified to perform the essential functions of the job, and (3) Plaintiff failed to establish any failure to accommodate by Defendant.

### 1.    Disabled within the Meaning of the ADA

First, Defendant argues that Plaintiff is not disabled within the meaning of the ADA.  Under the ADA, "disability" is defined as "[i] a physical or mental impairment that substantially limits one or more major life activities of such individual; [ii] a record of such an impairment; or [iii] being regarded as having such an impairment."  42 U.S.C. § 12102(1).  Plaintiff claims that he meets all three (3) of these "disability" definitions.

### a.    Actual Disability

Under the first definition of disability, Plaintiff must demonstrate that he has (1) a physical or mental impairment that (2) substantially limits (3) one or more major life activities.  Defendant argues that Plaintiff has failed to present any evidence of major limitations at the time of the alleged adverse employment actions besides his "conclusory testimony and self-reported limitations from *four years* prior to Plaintiff's termination." (Doc. 36, at 7.)  However, Plaintiff has presented evidence of his muscular dystrophy,

19

which is presumed under ADA regulations to "substantially limit[] neurological function,"
which is a major life activity.  29 C.F.R. § 1630.2(j)(3)(iii); *see also* 29 C.F.R. §
1630.2(i)(1)(ii) (listing neurological function as a major bodily function in defining "[m]ajor
life activities" under the statute).  Therefore, under ADA regulations, muscular dystrophy
is presumed to substantially limit a major life activity.  *See Christman v. Tymaco, Inc.*, No.
07-397, 2008 WL 1995308 (W.D. Pa. May 6, 2008) (finding that the plaintiff was an
individual with a disability within the meaning of the ADA because he had
facioscapulohumeral muscular dystrophy, which is a form of muscular dystrophy that
causes progressive weakning and loss of skeletal muscles).  Additionally, Plaintiff has
presented evidence that his muscular dystrophy has affected his neurological function.
(*See, e.g.*, Doc. 34-5, Ex. P-3, Geisinger Medical Records, at 1 ("[Plaintiff] notes some
fogginess of his thinking at times - memory is not as efficient as it had been previously").)

Defendant argues that Plaintiff cannot reconcile the inherent contradiction that
muscular dystrophy allegedly limited neurological functions, yet muscular dystrophy never
affected his ability to work or perform the essential functions of the Press Mechanic
position.  (Doc. 36, at 8.)  However, the fact that muscular dystrophy affects Plaintiff's
neurological functions but not the essential functions of the Press Mechanic position,
such as walking, standing, reaching, and lifting, does not disqualify Plaintiff from meeting
the definition of "disabled" under the ADA.  *See* 29 C.F.R. § 1630.2(j)(1)(viii) ("An
impairment that substantially limits one major life activity need not substantially limit other
major life activities in order to be considered a substantially limiting impairment.").

Further, ADA regulations explain that the term "major" in "major life activities"
should "not be interpreted strictly to create a demanding standard for disability," and that
"[w]hether an activity is a 'major life activity' is not determined by reference to whether it is
of 'central importance to daily life.'" 29 C.F.R. § 1630.2(i)(2).  ADA regulations explain

20

that the "primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, ***not whether an individual's impairment substantially limits a major life activity***." 29 C.F.R. § 1630.2(j)(1)(iii) (emphasis added).  Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis."  *Id.*  Although Defendant argues that Plaintiff cannot establish that muscular dystrophy substantially limited his ability to perform certain life activities, such as run, walk, climb, or lift, Defendant does not rebut Plaintiff's argument that muscular dystrophy substantially limits his neurological functions, which falls within the scope of the ADA.  *See* 29 C.F.R. § 1630.2(j)(3)(iii) (listing "[p]redictable assessments" in what constitutes a disability under the ADA, noting that "it should be easily concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . muscular dystrophy substantially limits neurological function . . . .").  Accordingly, Plaintiff has presented a genuine issue of fact regarding whether he has an actual disability under the ADA.  Defendant's motion for summary judgment on this issue will be denied.

### b.      Record of Disability

Defendant also argues that Plaintiff failed to demonstrate that he has a record of a disability.  An individual has a record of a disability if he has a "history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k).  Here, Plaintiff has provided sufficient evidence regarding a record of disability to proceed to trial.  As explained above, Plaintiff has provided medical records demonstrating that he has a history of muscular dystrophy, which substantially limits his neurological function.  Accordingly, Defendant's motion for summary judgment on this issue will be denied.

### c.     Regarded as Disabled

Defendant also argues that Plaintiff failed to demonstrate that he was regarded as disabled.  An individual is "regarded as disabled" if he is "subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity." 29 C.F.R. § 1630.2(l).  A "regarded as disabled" claim "focuses not on [Plaintiff] and [his] actual abilities, but rather on the reactions and perceptions of the persons interacting or working with [him]."  *Kelly v. Drexel Univ.*, 94 F.3d 102, 108-09 (3d Cir. 1996).  Plaintiff contends that Defendant regarded him as disabled because Defendant was aware that he had been diagnosed with muscular dystrophy and as a result, required him to undergo a battery of medical examinations, including a full functional capacity evaluation, and ultimately terminated his employment on August 23, 2013.  Defendant argues that Plaintiff's support for a "regarded as disabled" claim is a recitation of facts surrounding his return to work for his workers' compensation injury, not for muscular dystrophy.  However, there is a genuine issue of material fact as to whether the actions taken by Defendant–requiring Plaintiff to undergo a series of medical examinations and then ultimately terminating his employment–were taken based on Plaintiff's previous work-related injury, as asserted by Defendant, or based on Plaintiff's muscular dystrophy, as asserted by Plaintiff.  For example, Plaintiff has provided evidence of an October 19, 2011 e-mail exchange among Mr. Connors, Ms. Trovitch, and others, regarding observations of Plaintiff's limp becoming more prominent, in which Mr. Connors made repeated references to Plaintiff's muscular dystrophy:

> [T]hat's enough - whatever has to be done to deny this WC - please do it immediately - this man does not have a preexisting condition of degenerative disc - that is a byproduct of his **condition**.  Now we know what he has and we will not pay any more for WC - **does the Dr. even know what he has?  He has <u>MD</u>** - we are not going to pay for this - Kristin - how do we deny this?  This is not our injury - we cannot aggravate MD.

(Doc. 34-3, Ex. P-1, at 74 (emphasis added).)

Further, on October 21, 2011, Plaintiff asked Ms. Trovitch what he would have to do to return to work.  During that conversation, Ms. Trovitch stated that Silgan felt that he was too much of a liability with his condition.  (Doc. 29-21, Def. Ex. G, at 33; Doc. 34-4, Ex. P-2, James M. Yanoski Dep., at 68:21-69:9.)  Silgan then required Plaintiff to undergo an independent medical examination by Dr. Joshua Krassen of VSAS Orthopedics, who, on June 25, 2012, opined that Plaintiff could return "to medium duty work capacity level" and that Plaintiff was "capable of lifting at least 25-pounds, which is within his job description."  (Doc. 29-45, Def. Ex. EE, Dr. Krassen's June 25, 2012 Medical Report of Plaintiff, at 236-39.)  After Dr. Krassen's report was issued, Plaintiff wrote a letter to Ms. Trovitch again requesting to return to work.  Ms. Trovitch never responded.

On March 6, 2013, in an e-mail from the ESIS claim representative to Ms. Trovitch and Ms. Rinaldi, the ESIS claim representative stated, "with regard to the employment issues, [Plaintiff] has significant pre-existing conditions and may not be fit for duty based on the pre-existing conditions."  (Doc. 34-11, Ex. P-9, at 259.)  This was stated even though Plaintiff had fully recovered from his shoulder injury.  (Doc. 29-50, Def. Ex. JJ, at 286.)

On March 22, 2013, the claims representative forwarded an e-mail to Ms. Trovitch and Ms. Rinaldi advising that Plaintiff "has extensive pre-existing issues which makes him a risk for the site and organization as a whole."  (Doc. 34-11, Ex. P-9, at 283.)  That same day, Ms. Trovitch advised Plaintiff as follows:

> [W]e need a current medical report from your doctor that states what your current restrictions are since the last medical information we have is outdated.  Once we receive that, we will review it and determine if we need additional information to make our decision [to return you to work]."

(Doc. 29-50, Def. Ex. JJ.)

On April 4, 2013, Plaintiff provided the job description and job demand analysis to his primary care physician, Dr. John Haber.  Dr. Haber cleared Plaintiff to return to work without any restrictions.  (Doc. 34-11, Ex. P-9, at 297 ("The patient may return to his full

23

job no restrictions as before.").)  Silgan received Dr. Haber's note on April 9, 2013.  (Doc. 34-11, Ex. P-9, at 296; Doc. 34-9, Ex. P-7, Nancy Trovitch Dep., at 116:3-14.)

However, after being released to work by multiple physicians, Defendant still did not permit Plaintiff to return to work, with or without restriction.  Rather, Silgan required Plaintiff to undergo a fitness for duty examination.  (Doc. 34-9, Ex. P-7, Nancy Trovitch Dep., at 117:6-14.)  Ms. Trovitch claimed that she was concerned that Dr. Haber's note did not specifically mention the job description and analysis so she could not be certain that he had reviewed them.  (Doc. 34-9, Ex. P-7, Nancy Trovitch Dep., at 118:2-10.)  However, no one on behalf of Silgan ever asked Plaintiff or Dr. Haber whether the job description and demands analysis were reviewed.  (Doc. 34-9, Ex. P-7, Nancy Trovitch Dep., at 118:11-25; Doc. 34-10, Ex. P-8, Claudia Rinaldi Dep., at 92:1-8.)

On April 17, 2013, Ms. Trovitch advised Plaintiff that a fitness for duty examination was required because of his "condition."  When Plaintiff asked "what condition," Ms. Trovitch replied, "you know, Jim, your condition."  There is a genuine issue of material fact as to whether this "condition" referred to muscular dystrophy.  Indeed, there is evidence that Ms. Trovitch then suggested that instead of returning to work, Plaintiff apply for Social Security Disability benefits.  (Doc. 34-4, Ex. P-2, James M. Yanoski Dep., at 153:8-154:17; Doc. 29-18, Def. Ex. D, at 133.)

On May 21, 2013, Dr. Nancy Spangler performed a fitness for duty examination on Plaintiff.  (Doc. 34-11, Ex. P-9, at 326-27.)  Dr. Spangler indicated that Plaintiff was deconditioned from being out of work and needed to undergo a full functional capacity examination.  Like Dr. Spangler, Mr. Sallemi believed that it was Silgan's responsibility to pay for the full functional capacity exam.  (Doc. 34-12, Ex. P-10, Bennett Sallemi Dep., at 29:2-22.)  However, Silgan refused to pay.  (Doc. 34-10, Ex. P-8, Claudia Rinaldi Dep., at 109:6-110:5.)  On June 27, 2013, Mr. Sallemi advised Ms. Rinaldi that Silgan was violating the CBA and discriminating against Plaintiff because of a medical disability.  (Doc. 34-11, Ex. P-9, at 331.)

On July 1, 2013, Plaintiff filed a grievance, citing Silgan's refusal to allow him to

24

return to work.  On July 8, 2013, Plaintiff requested two (2) reasonable accommodations at a meeting between the Union and Silgan:  (1) to return to work but not on Line 15, or (2) return to work on Line 15 but be provided with assistance carrying plates.  Ms. Trovitch admitted that Plaintiff's requests for accommodations were reasonable.  (Doc. 34-9, Ex. P-7, Nancy Trovitch Dep., at 147:14-148:2.)  However, Plaintiff's requests were rejected by Defendant and no alternative accommodations were ever suggested.  (Doc. 34-12, Ex. P-10, Bennett Sallemi Dep., at 37:14-20; 37:25-38:6.)  Mr. Sallemi testified that Silgan never stated that the accommodations requested by Plaintiff would cause an undue burden upon Silgan.  (Doc. 34-12, Ex. P-10, Bennett Sallemi Dep., at 40:2-5.)

Despite Silgan's refusal to pay for the full functional capacity examination, there is evidence that Plaintiff made a good faith overture to pay for the exam in exchange for assurances that he would be permitted to return to work if he passed.  However, Silgan did not provide any such assurances.  Silgan ultimately fired Plaintiff on August 23, 2013.

Based on all of the evidence submitted, Plaintiff has presented a genuine issue of material fact as to whether Defendant regarded him as disabled.  A reasonable juror could conclude from the evidence that after learning of his muscular dystrophy, Defendant required Plaintiff to undergo a series of medical examinations and ultimately terminated Plaintiff's employment based on this disability.  Accordingly, Defendant's motion for summary judgment on this issue will be denied.

### 2.    Qualified to Perform the Essential Functions of the Job

Next, Defendant argues that Plaintiff was not qualified to perform the essential functions of the Press Mechanic job.  A "qualified" individual with a disability depends on whether the individual, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires" at the time of the adverse employment action was taken.  42 U.S.C. § 12111(8); *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).  The EEOC regulations divide this inquiry into two (2) parts:  (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the

25

individual, with or without reasonable accommodation, can perform the essential functions of that position." *Turner v. Hershey Chocolate U.S.*, 449 F.3d 604, 611 (3d Cir. 2006) (citing 29 C.F.R. § 1630.2(n)).  It is only this second part of the inquiry that is being challenged here.  This part of the inquiry, whether a job duty is an "essential function," turns on whether it is "fundamental" to the employment position.  29 C.F.R. § 1630.2(n)(1).  This is a "factual determination made on a case by case basis." *Bisker v. GGS Information Servs., Inc.*, No. 1:CV-07-1465, 2010 WL 2265979, at *2 (M.D. Pa. June 2, 2010).

Defendant contends that Plaintiff is unqualified.  Plaintiff contends that he is, and notes that Defendant expressly acknowledged in their motion for summary judgment that "[n]one of Plaintiff's supervisors ever observed Plaintiff having *any* difficulty performing the physical requirements of the Press Mechanic position."  (Doc. 31, at 9 (citing Doc. 29-9, Frederick Huntowski Dep., at 13:24-14:1; Doc. 29-8, George Yencha Dep., at 21:8-16).)  In his deposition, Ms. Rinaldi was unable to identify any essential function in the job description that Plaintiff was unable to perform.  (Doc. 34-10, Ex. P-8, Claudia Rinaldi Dep., at 128:14-131:8.)

Defendant argues that Plaintiff is unqualified because he claims he can only work on Lines 1-14, but not 15.  Although Plaintiff requested that he return to work but not on Line 15, he did not testify that he was incapable of working on Line 15.  There is also no other evidence demonstrating that he was incapable of working on Line 15.  Indeed, Defendant's motion for summary judgment suggests otherwise.  (Doc. 31, at 11 ("Plaintiff has not identified a single essential function of the Press Mechanic position, which he *could not* perform on Line 15, but that he *could* perform on Lines 1-14.").)  The evidence also suggests otherwise.  (*See* Doc. 29-52, Def. Ex. LL, April 4, 2013 Note from Dr. John Haber (stating that Plaintiff "may return to his full job no restrictions as before").)

More importantly, however, there is a genuine issue of material fact as to whether requesting to not work on Line 15 or for assistance with working on Line 15 makes Plaintiff unqualified.  Plaintiff admits that he requested to only work Lines 1-14, or to get

some assistance on Line 15, due to his concern that Line 15, which has three (3) presses and runs faster than the other lines, requires more physical labor and lifting.  Plaintiff contends that this does not make him unqualified, since nowhere in the Press Mechanic Job Description or the Job Demands Analysis is there a requirement that press line mechanics work on all fifteen (15) lines.  (Doc. 29-17, Def. Ex. C; Doc. 34-10, Ex. P-8, Claudia Rinaldi Dep., at 118:14-119:1.)  Indeed, Mr. Sallemi testified in his deposition that press line mechanics receive assistance lifting planes on Line 15 "all the time."  (Doc. 34-12, Ex. P-10, Bennett Sallemi Dep., at 38:7-10.)  This would suggest that requiring assistance with working on Line 15 does not make Plaintiff unqualified.

However, Defendant argues that this request makes Plaintiff unqualified for the job because lifting and loading strips is an essential function of all lines.  The parties' dispute over whether Plaintiff is qualified is ultimately a factual one.  *Orner v. Nat'l Beef Packaging Co.*, No. 4:13-cv-0837, 2015 WL 2452610, at *10 (M.D. Pa. Mar. 23, 2015).  Accordingly, Defendant's motion for summary judgment on this issue will be denied.

### 3.   Failure to Accommodate

The ADA requires an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," unless the employer can demonstrate that the accommodation would "impose an undue hardship on the operation of the business."  42 U.S.C. § 12112(b)(5)(A).  To demonstrate a failure to accommodate, Plaintiff must establish that (1) Defendant knew about his disability; (2) Plaintiff requested accommodations for his disability; (3) Defendant did not make a good faith effort to assist Plaintiff in seeking accommodations; and (4) Plaintiff could have been reasonably accommodated but for Defendant's lack of good faith. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319-20 (3d Cir. 1999).  The question of whether a proposed accommodation is reasonable is also a question of fact.  *Orner v. Nat'l Beef Packaging Co.*, No. 4:13-cv-0837, 2015 WL 2452610, at *10 (M.D. Pa. Mar. 23, 2015) (citing *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 286 (3d Cir. 2001)).

Here, Plaintiff requested to either only work on Lines 1-14 and not Line 15, or to

obtain assistance with working on Line 15.  Defendant argues that this request "is not a reasonable accommodation because the essential functions of the job are the same for every line."  (Doc. 31, at 13.)  Plaintiff disputes this fact, and maintains that Line 15, which has three (3) presses and runs faster than the other lines, requires more physical labor and lifting, and is therefore different from other lines.  (Doc. 34, at 18-19.)  There is evidence supporting both positions, and therefore a reasonable juror could conclude that either position is correct.  Accordingly, Plaintiff has presented a genuine issue of material fact as to whether his requested accommodations were reasonable.  Defendant's motion for summary judgment on this issue will be denied.

Additionally, even assuming Plaintiff's requested accommodations were not reasonable, there is a genuine issue of material fact as to whether Defendant made a good faith effort in furthering the interactive process of finding reasonable accommodations for Plaintiff.  For example, there is no evidence that Defendant offered any alternative accommodations to Plaintiff.

Defendant argues that they did engage in the interactive process by stating that discussions about possible reasonable accommodations for Plaintiff would first require medical documentation and a fully functional capacity test.  (Doc. 29-58, Def. Ex. RR, Silgan's Response to Plaintiff's Grievance, at 89 ("Any discussion on accommodations would need to have medical documentation from a doctor as recommended in the fit for duty report by a fully functional capacity test as it relates to the Job Demand Analysis for Jim's position and not solely Jim's subjective request for accommodations.").)  *See also Steffes v. Stepan Co.,* 144 F.3d 1070, 1073 (7th Cir. 1998) (employer not liable for failing to provide reasonable accommodation where employee failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions); *Taylor*, 184 F.3d at 317 (explaining that employers can show their good faith in a number of ways, such as requesting information about the condition and what limitations the employee has).  Plaintiff was willing to obtain medical documentation and undergo a fully functional capacity examination.  However, because the exam was expensive and Defendant

refused to pay for it, Plaintiff offered to take the exam and pay for it himself on the condition that Defendant reassure him in writing that he could return to work if he passed. (Doc. 29-62, Def. Ex. VV.)  This offer apparently went ignored by Defendant, and therefore unlike in *Steffes* and *Taylor*, the two (2) cases upon which Defendant relies, there is a genuine issue of material fact as to whether Defendant upheld their responsibility to engage in the interactive process with Plaintiff.

For example, in *Steffes*, "[t]he doctor's letter purportedly clearing the plaintiff to return to work not only failed to address the exposure issues legitimately raised by [Defendant], but it also displayed a poor understanding of the physical layout of the plant and the various activities occurring in and around the warehouse." *Steffes*, 144 F.3d at 1073.  The plaintiff, who had worked in the warehouse for fourteen (14) years, had it within her power to explain the nature of the job to her doctor and to obtain a more comprehensive letter.  *Id.*  Furthermore, even though the defendant decided not to rehire the plaintiff because of her inadequate release, they asked her to provide updates if her condition changed so that the company could continue to consider her for job openings. *Id.*  However, she failed to provide any further information to the company, and therefore the court found that she failed to uphold her end of the interactive process.  *Id.*; *see also Taylor*, 184 F.3d at 318-19 (denying summary judgment for the defendant because there were genuine disputes about the defendant's good faith participation in the interactive process) (citing *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626 (7th Cir. 1998) (refusing to grant an employer summary judgment because disputes of fact remained about which party caused the breakdown in the interactive process)).  Here, like in *Baert*, disputes of fact remain about which party caused the breakdown in the interactive process.  A reasonable juror could conclude that Defendant did not engage in the interactive process in good faith and instead, was simply creating artificial hoops for Plaintiff to jump through to avoid an actual discussion of reasonable accommodations.  Therefore, Defendant's motion for summary judgment on this issue will be denied.

**D.      Legitimate, Non-Discriminatory Reasons and Pretext**

Defendant argues that even if Plaintiff has demonstrated a prima facie case of discrimination, he cannot overcome Defendant's articulated legitimate, non-discriminatory reason for terminating Plaintiff's employment, namely, application of a medical leave policy after an extended absence from work.  *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (explaining that a plaintiff may avoid summary judgment by pointing to "some" evidence from which a factfinder could reasonably conclude that the defendant's proffered reasons were fabricated (pretextual), and in determining what quantum of evidence is required, explaining that "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that ***each*** of the employer's proffered non-discriminatory reasons was either a ***post hac*** fabrication or otherwise did not actually motivate the employment action").  Defendant argues that Plaintiff was terminated from employment on August 23, 2013, pursuant to Article IX, Section 6(g) of the CBA, which gives Silgan the right to terminate employment after two (2) years of medical leave.  The existence of this medical leave policy under the CBA is uncontroverted.  Plaintiff admits that he "was terminated effective August 23, 2013 based on Article IX, Section 6(g) of the CBA."  (Doc. 35-1, Plaintiff's Counterstatement ¶ 144.)

Upon Defendant's showing of a legitimate, non-discriminatory reason for Plaintiff's termination, it is Plaintiff's "difficult burden" to establish that Defendant's articulated reason was merely pretext for discrimination.  *Proudfoot v. Arnold Logistics, LLC*, 59 F. Supp. 3d 697, 705 (M.D. Pa. 2014).  Plaintiff does not appear to dispute that Defendant has satisfied its "relatively light" burden of articulating a legitimate, non-discriminatory reason for terminating Plaintiff's employment.  Rather, Plaintiff asserts that Silgan's proffered reasons are mere pretext for discrimination.  Specifically, Plaintiff contends that "[a]t this summary judgment stage, a proper inference can (and must) be drawn that Silgan's proffered reasons are mere pretext for discrimination," because after learning of Plaintiff's muscular dystrophy, Silgan refused to bring him back to work even after arguing during the worker's compensation process that he was able to work, and required Plaintiff

30

to undergo a battery of medical examinations, including a full functional capacity examination, which was never required of any other employee seeking a return to work. Additionally, Plaintiff asserts that throughout the time he was trying to return to work, Silgan often referred to Plaintiff's "condition" and "muscular dystrophy" as being a liability or a risk.  Plaintiff contends that taking all of these facts together and construing them in the light most favorable to Plaintiff, a reasonable juror could conclude that the real reason Silgan fired him was because of preconceived stereotypes about muscular dystrophy.  I agree.

On August 18, 2011, Plaintiff suffered an injury to his shoulder while fixing a machine on Line 15.  (Doc. 29-27, Def. Ex. M.)  It is Defendant's policy to return an employee to work as soon as practicable, with or without restrictions, after experiencing a work injury.  (Doc. 34-9, Ex. P-7, Nancy Trovitch Dep., at 31:8-16; Doc. 34-13, Ex. P-11, John Connors Dep., at 80:15-19.)  However, notwithstanding Plaintiff's repeated requests to return to work and releases from multiple doctors, Defendant would not allow Plaintiff to return to work.  Plaintiff has provided evidence from which a reasonable juror could conclude that this was because of Plaintiff's muscular dystrophy.  For example, on September 23, 2011, Plaintiff was seen by Dr. Anthony Falvello, the worker's compensation physician assigned to Plaintiff's claim, who discussed Plaintiff's muscular dystrophy diagnosis in front of Ms. Dennis, the Nurse Case Manager for Plaintiff's worker's compensation claim.  Thereafter, Ms. Dennis and Ms. Trovitch discussed Plaintiff's muscular dystrophy on multiple occasions.

On October 4, 2011, Ms. Trovitch suggested to Ms. Dennis that Plaintiff could return to light duty work and scan documents.  (Doc. 34-3, Ex. P-1, at 51.)  In this same e-mail chain, there is an e-mail from Peggy Kassak indicating that this type of light-duty scanning work had been offered to employees in the past.  (Doc. 34-3, Ex. P-1, at 47.)  However, in a later e-mail on October 19, 2011, Ms. Trovitch states to Ms. Dennis and Ms. Swineford that they have decided not to bring Plaintiff in on light duty until they see Dr. Falvello's report.  (Doc. 34-3, Ex. P-1, at 66.)  As noted earlier, there is an October

19, 2011 e-mail from Mr. Connors to Ms. Dennis, Ms. Trovitch, and Ms. Swinford, stating

as follows:

> [T]hat's enough - whatever has to be done to deny this WC - please do it
> immediately - this man does not have a preexisting condition of
> degenerative disc - that is a byproduct of his **condition**.  Now we know
> what he has and we will not pay any more for WC - **does the Dr. Even
> know what he has?  He has <u>MD</u>** - we are not going to pay for this - Kristin
> - how do we deny this?  This is not our injury - we cannot aggravate MD.

(Doc. 34-3, Ex. P-1, at 74 (emphasis added).)

On October 17, 2011, Dr. Falvello released Plaintiff to return to work with some

restrictions.  (Doc. 29-35, Def. Ex. U, at 141.)  On November 29, 2011, Plaintiff was

examined by Dr. Kline, who also reported that Plaintiff could be released to "a sedentary

duty level of work, lifting or carrying no more than 10 pounds with the avoidance of

repetitive flexion of the cervical spine."  (Doc. 29-41, Def. Ex. AA, at 179.)  Despite

releases from both Dr. Falvello and Dr. Kline, Silgan still did not allow Plaintiff to return to

work, and when asked why in her deposition, Ms. Trovitch responded, "I don't know."

(Doc. 34-9, Ex. P-7, Nancy Trovitch Dep., at 82:1-83:10.)  Based on this evidence, a

reasonable juror could conclude that Defendant's decision to terminate Plaintiff from

employment was actually motivated by Plaintiff's muscular dystrophy, not whether he was

cleared by medical doctors to return to work.

Further, Silgan then required Plaintiff to undergo an independent medical

examination by Dr. Joshua Krassen of VSAS Orthopedics.  On June 25, 2012, Dr.

Krassen also reported that Plaintiff could be released to return to work:

> As far as activity level, I do feel he should be able to return to work, at least
> at a light to medium duty work capacity level.  I do feel he is capable of
> lifting at least 25-pounds, which is within his job description.

(Doc. 29-45, Def. Ex. EE, Dr. Krassen's Report, at 239.)  There is evidence suggesting

that after Dr. Krassen's report was issued, Plaintiff wrote a letter to Ms. Trovitch again

requesting a return to work, but she never responded.  (Doc. 29-21, Def. Ex. G, at 33.)

Plaintiff maintains that after Defendant learned of Plaintiff's muscular dystrophy,

he received notice not to return to work, his worker's compensation was terminated, and

after several attempts to return to work, he was told by Ms. Trovitch that he could "not come back in any capacity" because he was "to [sic] much of a liability." (Doc. 29-21, Def. Ex. G, at 33.) Another Silgan e-mail written by Rishi Kuthlala, a Claims Representative, on March 22, 2013, to Ms. Trovitch, Ms. Rinaldi, and others, states that Plaintiff "has extensive pre-existing issues which makes him a risk for the site and organization as a whole." (Doc. 34-11, Ex. P-9, at 283.)

On April 4, 2013, Plaintiff provided his job description and job demand analysis to his primary care physician, Dr. Haber, as requested by Ms. Trovitch. Dr. Haber cleared Plaintiff to return to work without any restrictions. (Doc. 34-11, Ex. P-9, at 296-97.) Silgan received Dr. Haber's note on April 9, 2013. (*Id.* at 296.) Despite being released by four (4) physicians, Silgan still did not permit Plaintiff to return to work, with or without restrictions. Instead, Silgan then required Plaintiff to undergo a fitness for duty examination. Plaintiff contends that when Ms. Trovitch advised him that he would need a fitness for duty examination because of his 'condition," he asked her what condition, to which she responded, "you know, Jim, your condition." (Doc. 29-18, Def. Ex. D., at 133.)

On May 21, 2013, Dr. Spangler performed a fitness for duty examination on Plaintiff, but in her report, noted that she could not determine in the exam room whether or not he was capable of performing all of the functions of the press mechanic and that she felt "the only way that [she] could hope to determine his fitness for duty is if he were to undergo a full functional capacity evaluation." (Doc. 34-11, Ex. P-9, at 328.) Silgan refused to pay for the full functional capacity exam. (Doc. 34-10, Ex. P-8, Claudia Rinaldi Dep., at 109:6-17.) Plaintiff then offered to pay for the full functional capacity evaluation in exchange for assurances that he would be permitted to return to work if he passed. (Doc. 34-17, Ex. P-15, at 305-07.) Silgan never responded. (Doc. 29-12, Bennett Sallemi Dep., at 42:5-43:4.) Silgan ultimately fired Plaintiff on August 23, 2013, contending that he had been out of work for two (2) years. A reasonable juror could conclude from this evidence, in particular, Silgan's repeated requests for additional medical documentation, Silgan's numerous references to Plaintiff's "condition," and

failure to respond to Plaintiff's offer to pay for the full functional capacity examination in exchange for assurances that he would be permitted to return to work if he passed, that Silgan's proffered reasons for termination–Plaintiff's absence from work for two (2) years–were pretextual.  Accordingly, Plaintiff has presented a genuine issue of material fact on the issue of pretext and Defendant's motion for summary judgment on this issue will be denied.

### III. Conclusion

For the above stated reasons, Defendants' motion for summary judgment will be granted in part and denied in part.

An appropriate order follows.


April 27, 2016                                          /s/ A. Richard Caputo
Date                                                      A. Richard Caputo
                                                          United States District Judge

34